# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PHUNWARE, INC., and RAIN ACQUISITION, LLC, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Civ. No. 15-216-SLR |
| EXCELMIND GROUP LIMITED, and EXCELMIND CAPITAL LIMITED, and SEAWOOD RESOURCES, INC., | ) ) ) ) |
| Defendants. | ) ) |

Bradley D. Sorrels, Esquire, Ian R. Liston, Esquire, and Jessica A. Montellese, Esquire of Wilson Sonsini Goodrich & Rosati, P.C. Counsel for Plaintiffs.

J. Clayton Athey, Esquire, and Eric J. Juray, Esquire of Prickett, Jones, and Elliott, P.A. Counsel for Defendants Excelmind Capital Limited and Excelmind Group Limited. Of Counsel: Howard M. Privette, Esquire and Edward Han, Esquire of Paul Hastings LLP.

William D. Johnston, Esquire and Mary Francis Dugan, Esquire of Young, Conaway, Stargatt & Taylor LLP. Counsel for Defendant Seawood Resources Inc.

## MEMORANDUM OPINION

Dated: July 30, 2015
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On March 6, 2015, plaintiffs Phunware, Inc. ("Phunware") and Rain Acquisition, LLC ("Rain") (collectively, "plaintiffs") filed this action for damages against Excelmind Group Limited, Excelmind Capital Limited, and Seawood Resources, Inc. (collectively, "defendants"), alleging breach of a Share Purchase Agreement dated October 7, 2014 (the "SPA" or the "Agreement"), and other tortious conduct. Presently before the court are Excelmind Group ("Excelmind") and Excelmind Capital Limited's ("ECL," and collectively, "ECL defendants") motion to dismiss (D.I. 10), ECL defendants' motion to assess costs and for a stay pursuant to Federal Rule of Civil Procedure 41(d) (D.I. 12), and Seawood Resources, Inc.'s ("Seawood") motion to dismiss (D.I. 23). The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. For the reasons that follow, the court grants ECL defendants' motions to dismiss, denies ECL defendants' motion to assess costs and for a stay, and grants Seawood's motion to dismiss.

## II. BACKGROUND

### A. The Parties

Phunware and Rain are Delaware corporations with Phunware's principal place of business in Austin, Texas. (D.I. 2 at ¶ 12) Excelmind and ECL are British Virgin Islands corporations. Seawood is a Philippines corporation with its principal place of business in Makati City, Manila, Philippines. (D.I. 2, ¶ 8; D.I. 24 at 9; D.I. 36 at ¶ 4)

## B. Background

### 1. The SPA

Plaintiffs allege that defendants approached the IG Group[1] about a potential acquisition of the IG Group. (D.I 2 at ¶¶ 15-16) On July 8, 2014, Seawood Managing Director Marie Grace Vera Cruz ("Vera Cruz") and IG Group CEO John Alonte ("Alonte") signed a Letter of Intent ("LOI") that set forth material terms for the acquisition. (*Id.* at ¶ 18) The LOI contained conditions for closing the transaction, a broad "Exclusive Dealing" provision, and a Delaware choice of law provision. (D.I. 31, ex. A at 3-5)

These negotiations ultimately resulted in the SPA, whereby plaintiffs were to purchase all of the outstanding equity in privately-held Excelmind for $6 million and approximately $27 million in Phunware stock. (D.I. 2 at ¶ 2) The SPA, which superseded the LOI, was finalized on October 7, 2014, and contained a drop dead date for the transaction 30 days following the execution of the SPA. (*Id.*, ex. A at 68, 72; ¶¶ 1, 2, 21, 22) The SPA is a contract among Phunware, Rain, Excelmind, and ECL. (D.I. 2 at ¶ 22)

Defendant Seawood, alleged to have a "control relationship" with ECL, was not a party to the SPA. (*Id.* at ¶¶ 2, 5, 22) Vera Cruz, Seawood's Managing Director, signed the SPA as "Director" of ECL defendants. (D.I. 2, ex. A at 75)

ECL defendants point to the following provisions of the SPA as relevant to the instant dispute: (a) SPA § 9.01, the drop dead date termination provision providing that

---

[1] The IG Group is a number of corporate entities controlled by Excelmind relating to the provision of mobile telephone services in the Philippines. (D.I. 2 at ¶ 14) ECL owns 95% of Excelmind. (D.I. 36 at ¶ 8)

if closing did not occur within a 30-day window,[2] the "Agreement may be terminated and the Share Purchase abandoned at any time prior to the Closing Date," as long as the terminating party had not failed to fulfill any obligation that was "the cause of, or resulted in, the failure of the Closing Date to occur" (D.I. 2, ex. A at 68-69); (b) SPA § 10.02, stating that delayed or partial exercise of any "right, power, or privilege" under the SPA did not operate as a waiver or preclude further exercise of the right, power, or privilege (*Id.* at 71); (c) SPA § 7.01(l), providing a list of conditions to be met prior to closing, including Phunware's delivery of its financial statements to Excelmind (*Id.* at 60-61); (d) SPA § 7.01, stating that a waiver of closing conditions had to be in writing (*Id.* at 59-63); and (e) SPA § 10.05, a Delaware choice of law provision (*Id.* at 71).

Plaintiffs point to the following provisions of the SPA as relevant: (a) SPA § 7.01, containing a lengthy provision in which the parties sought to ensure one another that there was no "Material Deviation"[3] in the companies' finances which might be detrimental to an IPO (D.I. 2, ex. A at 59-63); (b) SPA § 6.09(a), providing that

until the earlier of the Closing and the date of termination of this Agreement pursuant to Section 9.01, neither the Company nor any of its Representatives . . . shall, directly or indirectly, take any of the following actions with any Third Party: (i) solicit, initiate, or agree to any proposals or offers from any Third Party . . . (ii) participate in any discussions or negotiations regarding, or furnish to any Third Party any information with respect to, or otherwise cooperate with, or knowingly facilitate or encourage any effort or attempt by any Third Party to do or seek, a Competing Transaction;

(*Id.* at 58); and (c) SPA § 9.01, the aforementioned termination provision (*Id.* at 68-69).

---

[2] The 30-day window expired on November 6, 2014.

[3] Section 7.01(l) required that parties act "reasonably and in good faith" by considering all "deviations as a whole . . . before exercising their rights to terminate this Agreement." (D.I. 2, ex. A at 61)

3

Plaintiffs did not provide the required audited financial statements by the November 6, 2014 drop dead date. (D.I. 2 at ¶¶ 28, 40) Plaintiffs allege, however, that they provided defendants with updated estimated adjusted revenue amounts as they waited for Ernst and Young, Phunware's outside auditors, to provide audited financial statements. Plaintiffs also allege that defendants never suggested that the updated estimates were problematic. (D.I. 2 at ¶¶ 28-29) After an in-person meeting on November 12, 2014, Seawood Director and Chairman of Seawood's Investment Committee stated that defendants were "looking forward to a successful conclusion of this transaction." (*Id.*) Phunware provided revenue estimates to defendants on November 14, November 22, and December 4, 2014. (*Id.* at ¶¶ 30-32) Alonte responded to the November 22, 2014 update by stating that he "was looking forward to getting this deal closed as well." (*Id.* at ¶ 31)

Plaintiffs allege that on December 4, 2014, Alonte acknowledged in emails having met with executives of an IG Group competitor, Xurpas, and "discussed the possibility of an alternative transaction." (D.I. 2 at ¶ 5) On December 5, 2014, ECL delivered to Phunware a written notice of termination ("Notice of Termination") pursuant to SPA Section 9.01(b). (D.I. 2 at ¶¶ 6, 42) The Notice of Termination[4] expressly referred to Phunware's failure to close prior to the November 6 drop dead date pursuant to SPA § 9.01(b)(i), Phunware's breach of representations and warranties regarding Phunware's financial statements pursuant to SPA § 5.12, and Phunware's failure to satisfy a closing condition pursuant to SPA § 7.01(l). (D.I. 2 at ¶¶ 6, 40, 44, 46)

---

[4] The notice was sent by Vera Cruz on behalf of ECL using her Seawood email account.

## 2. Court of Chancery

On December 16, 2014, plaintiffs filed a complaint in the Delaware Court of Chancery, alleging breach of contract and breach of the covenant of good faith and fair dealing. (D.I. 11, ex. A) Plaintiffs requested specific performance of the SPA and sought expedited relief. (D.I. 30 at 1) The Court of Chancery denied this motion to expedite on the basis that plaintiffs did not have a "sufficiently colorable claim." (D.I. 11, ex. B at 5) On January 5 and 6, 2015, defendants moved to dismiss for failure to state a claim. On February 4, 2015, ECL filed its combined brief in support of its motions to dismiss. On March 6, 2014, plaintiffs voluntarily dismissed the action and, on the same day, filed the pending action for damages in this court. (D.I. 13 at 1- 5)

## III. STANDARD OF REVIEW

### A. Assess Costs and for a Stay

"If a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court: (1) may order the plaintiff to pay all or part of the costs of that previous action; and (2) may stay the proceedings until the plaintiff has complied." Fed. R. Civ. P. 41(d).

Rule 41(d) endows federal courts with "broad discretion" to order stays and the payment of costs to deter "forum shopping and vexatious litigation."[5] *Esquivel v. Arau*, 913 F. Supp. 1382, 1386 (C.D. Cal. 1996); *see also Rogers v. Wal-Mart Stores, Inc.*, 230 F.3d 868, 874 (6th Cir. 2000) (stating that 41(d) is "intended to prevent attempts to

---

[5] Defendants conflate the rule as being one for which costs "should" be awarded, rather than "may" be awarded. (D.I. 13 at 7) Rather, the rule permits a court to award costs to a party defending the same action twice where the facts warrant such an award. *Meredith v. Stovall*, Civ. No. 99-3350, 2000 WL 807355, at \*4 (10th Cir. June 23, 2000).

5

gain any tactical advantage by dismissing and re-filing the suit"). "[T]he court should simply assess whether the plaintiff's conduct satisfies the [rule's] requirements" and grant the motion if "the circumstances of the case warrant an award . . . to prevent prejudice to the defendant." *See Esquivel*, 913 F. Supp. at 1388.

## B. Failure to State a Claim

A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint's factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545 (internal quotation marks omitted) (interpreting Fed. R. Civ. P. 8(a)). Consistent with the Supreme Court's rulings in *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Third Circuit requires a two-part analysis when reviewing a Rule 12(b)(6) motion. *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 219 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, a court should separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions. *Fowler*, 578 F.3d. at 210-11. Second, a court should determine whether the remaining well-pled facts sufficiently show that the plaintiff "has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). As part of the analysis, a court must accept all well-pleaded factual allegations in the complaint as true, and view them in the light most favorable to the plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

In this regard, a court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994).

The court's determination is not whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

## C. Personal Jurisdiction

Rule 12(b)(2) directs the court to dismiss a case when the court lacks personal jurisdiction over the defendant. Fed. R. Civ. P. 12(b)(2). When reviewing a motion to dismiss pursuant to Rule 12(b)(2), a court must accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor. *Traynor v. Liu,* 495 F. Supp. 2d 444, 448 (D. Del. 2007). Once a jurisdictional defense has been raised, the plaintiff bears the burden of establishing, with reasonable particularity, that sufficient minimum contacts have occurred between the defendant and the forum to support jurisdiction. *See Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n,* 819 F.2d 434, 437 (3d Cir. 1987). To meet this burden, the plaintiff must produce "sworn affidavits or other competent evidence," since a Rule 12(b)(2) motion "requires

resolution of factual issues outside the pleadings." *Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 67 n.9 (3d Cir. 1984).

To establish personal jurisdiction, a plaintiff must produce facts sufficient to satisfy two requirements by a preponderance of the evidence, one statutory and one constitutional. *See id.* at 66; *Reach & Assocs. v. Dencer,* 269 F.Supp.2d 497, 502 (D. Del. 2003). With respect to the statutory requirement, the court must determine whether there is a statutory basis for jurisdiction under the forum state's long-arm statute. *See Reach & Assocs.,* 269 F.Supp.2d at 502. The constitutional basis requires the court to determine whether the exercise of jurisdiction comports with the defendant's right to due process. *See id.*; *see also Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

Pursuant to the relevant portions of Delaware's long-arm statute, 10 Del. C. § 3104(c)(1)-(4), a court may exercise personal jurisdiction over a defendant when the defendant or its agent:

> (1) Transacts any business or performs any character of work or service in the State;
> (2) Contracts to supply services or things in this State
> (3) Causes tortious injury in the State by an act or omission in this State;
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State.

10 Del. C. § 3104(c)(1)-(4). With the exception of (c)(4), the long-arm statute requires a showing of specific jurisdiction. *See Shoemaker v. McConnell,* 556 F.Supp.2d 351, 354, 355 (D. Del. 2008). Subsection (4) confers general jurisdiction, which requires a greater number of contacts, but allows the exercise of personal jurisdiction even when

8

the claim is unrelated to the forum contacts. *See Applied Biosystems, Inc. v. Cruachem, Ltd.,* 772 F.Supp. 1458, 1466 (D. Del. 1991).

If defendant is found to be within the reach of the long-arm statute, the court then must analyze whether the exercise of personal jurisdiction comports with due process, to wit, whether plaintiff has demonstrated that defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum State," so that it should "reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980) (citations omitted). For the court to exercise specific personal jurisdiction consistent with due process, plaintiff's cause of action must have arisen from the defendant's activities in the forum state. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985). For the court to exercise general personal jurisdiction consistent with due process, plaintiff's cause of action can be unrelated to defendant's activities in the forum state, so long as defendant has "continuous and systematic contacts with the forum state." *Applied Biosystems, Inc.*, 772 F. Supp. at 1458.

## D. Jurisdictional Discovery

While plaintiffs shoulder the burden of demonstrating sufficient jurisdictional facts, "courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.'" *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 456 (3d Cir.2003) (quoting *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 107 F.3d 1026, 1042 (3d Cir.1997)). "If a plaintiff presents factual allegations that suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between [the parties] and the forum state,' the plaintiff's right to conduct jurisdictional discovery

9

should be sustained." *Id.* at 456 (*quoting Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino,* 960 F.2d 1217, 1223 (3d Cir.1992)). A court must determine whether certain discovery avenues, "if explored, might provide the 'something more' needed" to establish personal jurisdiction. *Toys "R" Us,* 318 F.3d at 456.

## IV. DISCUSSION

### A. Motion to Assess Costs and for a Stay

#### 1. Vexatious action and forum shopping

##### a. Relief sought is not repetitive

Defendants aver that the complaint filed in the present action is largely similar to that which was filed in the Court of Chancery action, rendering it repetitive and vexatious. Indeed, of the thirty-four factual allegations in the Chancery complaint, twenty-five were copied verbatim instantly. Of the remaining nine, three were omitted and six were not materially altered. Not one new allegation was added to the federal complaint. (D.I. 2 at ¶¶ 17, 39, 41, 45, 47; 16-47) Plaintiffs do not deny that the claims are similar. (D.I. 30 at 5-6)

However, the relief sought is not repetitive, as plaintiffs seek a different remedy in their second filing, that is, damages. Generally, costs have only been imposed in cases where "the plaintiff has brought an identical, or nearly identical claim and requested identical, or nearly identical **relief**."[6] *Young v. Dole,* 1991 WL 158977, at *3 (E.D.N.Y. July 11, 1991) (citations omitted).

---

[6] Defendants argue that relief need not be nearly identical if the claims are nearly identical, but the court finds no support for such proposition.

10

## b. Good faith

Plaintiffs aver that even if the complaints are similar, plaintiffs acted in good faith because they re-filed in order to avoid a dismissal for lack of subject matter jurisdiction in the Court of Chancery.   The Court of Chancery can acquire subject matter jurisdiction over a case in three ways:  (1) at least one claim for relief is equitable; (2) the plaintiff requests relief that is equitable; or (3) subject matter jurisdiction is conferred by statute. *Candlewood Timber Grp., LLC v. Pan. Am. Energy, LLC* , 859 A.2d 989, 997 (Del. 2004).  The fact that a complaint contains a prayer for an equitable remedy, without more, does not conclude the jurisdictional analysis.  The appropriate analysis requires a "realistic assessment of the nature of the wrong alleged and the remedy available in order to determine whether or not a legal remedy is available and fully adequate." *Id.*

Defendants cite the equity "clean-up" doctrine as evidence that plaintiffs were not acting in good faith when they withdrew their Court of Chancery suit and re-filed in District Court.[7]  Generally, the doctrine holds that a plaintiff may seek both equitable and legal relief in an equity court.  There are two relevant limitations: (1) the plaintiff must have a "good case in equity" if he wants an equity court to award him legal relief,

---

[7] Defendants cite a 1964 case in an attempt to demonstrate plaintiffs' bad faith. *See New Castle Cnty. Volunteer Firemen's Ass'n v. Belvedere Volunteer Fire Co.*, 202 A.2d 800, 803 (Del. 1964) ("[O]nce jurisdiction is properly obtained by Chancery, it will go on to decide the whole controversy, even though to do so involves the giving of a purely legal remedy).  In light of modern constructions of the "clean-up" doctrine, this citation is not persuasive.  Defendants cite another case indicating the plaintiffs may have not taken a "proper action;" the case indicates a preferred method of curing a procedural defect but does not necessarily indicate that plaintiffs acted in bad faith. *Ross v. Infinity Ins. Co.*, 2013 WL 2495114, at *4 (E.D. Pa. June 10, 2013) ("the proper action" to cure a procedural defect in a claim is generally to "seek to amend the complaint . . . in lieu of dismissing the entire action and re-filing again").

11

which is an absolute rule; and (2) the equitable relief must not be merely incidental to the legal relief sought, which is a discretionary rule. *Medtronic, Inc. v. Intermedics, Inc.*, 725 F.2d 440, 442-443 (7th Cir. 1984).

Although plaintiffs sought both damages and equitable relief in the Court of Chancery, in denying plaintiffs' motion to expedite, the court stated that plaintiffs did not state a colorable claim for specific performance.[8]  (D.I. 11, ex. B at 5)  As plaintiffs no longer had a "good case in equity," they chose to re-file in the District of Delaware, seeking money damages.  This is sufficient to meet the "minimal burden" that the second action is not vexatious.[9]  *See, e.g., Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 78 F.R.D. 445, 449, 449 n. 13 (D. Del. 1978).

### 2. Prejudice

To recover costs, defendants must show they suffered prejudice in the form of "needless expenditures."  *See Esquivel*, 913 F. Supp. at 1388.  This is especially true early in the litigation.  *See Atkinson v. Forest Research Institute, Inc.*, 2015 WL 790220, at \*6 (D.N.J. Feb. 25, 2015) (declining to award costs under 41(d) where action "ha[d] not progressed far beyond the initial pleadings, discovery [had] been minimal, [and] any materials that ha[d] been provided [would] likely be relevant in subsequent litigation").

---

[8] The "standard for colorability is a low one," as it "simply implies a nonfrivolous set of issues."  (D.I. 11, ex. B at 5)

[9] Defendants point to the Court of Chancery's statement that the Chancery complaint "simply" did not "impl[y] a nonfrivolous set of issues" as evidence of forum shopping and vexatious behavior.  (D.I. 11, ex. B at 5)  Although plaintiffs did wait until the day their response brief was due to voluntarily dismiss the action, the Court of Chancery's holding that plaintiffs did not state a colorable claim for specific performance is compatible with the notion of a good faith dismissal and filing in this court based on subject matter jurisdiction concerns.

12

The case-at-bar has not proceeded far past the pleadings. Moreover, defendants' motion to dismiss is similar to their motion to dismiss the Chancery complaint, rendering this part of the current litigation a low-cost endeavor.[10] (D.I. 30, ex. A) Therefore, the court concludes that defendants did not suffer prejudice.

## B. Failure to State a Claim

### 1. Breach of contract

"In order to survive a motion to dismiss for failure to state a breach of contract claim, [a] plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003) (citations omitted).

It is undisputed that plaintiffs and defendants entered into the SPA. (D.I. 2, ex. A) Plaintiffs allege that defendants' conduct breached these contracts; likewise, plaintiffs allege that they incurred monetary damages in an amount no less than $75,000. (D.I. 2 at ¶ 52)

"Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiffs." *WaveDivision Holdings, LLC v. Millennium Digital Media Systems, L.L.C.*, Civ. No. 2993-VCS, 2010 WL 3706624, at *13 (Del. Ch. 2010) (citing *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003)).

---

[10] Defendants' analogy to Federal Rule of Civil Procedure 41(a)(2) and invocation of 41(d)'s "deterrent effect" are of little consequence given the facts of the case. (D.I. 13 at 11-13)

ECL defendants assert that they were entitled to terminate the agreement.

"Under standard rules of contract interpretation, a court must determine the intent of the parties from the contract language." *Twin City Fire Ins. Co. v. Delaware Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003). Where the contract contains no ambiguity, "the Court interprets the contract based on the plain meaning of the language on the face of the contract." *Id.* The court may grant a motion to dismiss when unambiguous language of a contract contradicts plaintiffs' allegations in a complaint. *See Nat'l Distillers & Chem. Corp. v. Dep't of Energy*, 1980 WL 1057, at *1-3 (D. Del. Oct. 23, 1980).

SPA § 9.01 provides in relevant part:

> This Agreement may be terminated and the [SPA] abandoned at any time prior to the Closing Date . . . by either Purchaser or [ECL], by written notice to the other party, if . . . the Closing Date has not occurred prior to the 30th Day following the date of this agreement . . . provided that the right to terminate this Agreement under this Section 9.01(b)(i) shall not be available to any party whose failure to fulfill any obligation hereunder has been the cause of, or resulted in, the failure of the Closing Date to occur on or before the Termination Date and such action or failure constitutes a breach of this agreement.

(D.I. 2, ex. A at 68-69) (emphasis omitted). This section of the SPA created a drop dead date for closing of November 6, 2014, which plaintiffs did not meet.[11] As a consequence, § 9.01 allows for the SPA to be abandoned at any time prior to closing. The complaint does not allege that plaintiffs' failure to meet the deadline was due to conduct of ECL defendants and no language in the SPA indicates that ECL's reasons

---

[11] Section § 7.01(l) provides a list of conditions to be met prior to closing, including Phunware's delivery of its audited financial statements to ECL defendants. (D.I. 2, ex. A at 60-61) This provision, however, makes no mention of a drop dead date, only requiring that the conditions are met prior to closing and that plaintiffs' audited financial statement do not deviate from plaintiffs' financial statements. For this reason, and because the waiver analysis is identical, this court will analyze only whether ECL defendants waived their right to terminate the SPA following plaintiffs' undisputed failure to meet the drop dead date under SPA § 9.01.

for terminating after November 6, 2014, were relevant to the termination right. (D.I. 2, ex. A)

Plaintiffs, however, assert in their briefs that ECL defendants waived their right to terminate the SPA under § 9.01(b) in the time following plaintiffs' breach. (D.I. 31 at 21-23) SPA § 10.02 provides in relevant part that "no failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or of the exercise of any other right, power or privilege." (D.I. 2, ex. A at 71) Even though the parties continued to work towards a closing, ECL defendants maintained the right to exercise termination after the drop dead date. *See National Data Payment Sys., Inc. v. Meridian Bank*, 18 F. Supp. 2d 543 (E.D. Pa. 1998) (holding that even when parties negotiated after the drop dead date of a contract with a written waiver provision, the lack of an express written waiver, along with "no delay language" in the agreement, rendered defendants' termination of the contract valid), *aff'd*, 212 F.3d 849, 855 (3d Cir. 2000); *see also Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 2012 WL 3201139, at *26 (Del. Ch. Aug. 7, 2012) (emphasizing the importance of nonwaiver clauses because they "give parties a low-cost method of resolving some disputes arising under their agreement").

A waiver would only be effective if made in writing. In Delaware, "[w]aiver is the voluntary and intentional relinquishment of a known right. It implies knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those contractual rights." *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 1930428, at *6 (Del. Ch. June 19, 2007). SPA § 7.01 states that a waiver of closing

conditions must be in writing, and SPA § 10.02 provides in relevant part that "[a]ny provision of [the SPA] may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by the Company, Purchaser, and Shareholder, or in the case of a waiver, by the party against whom the waiver is to be effective." (D.I. 2, ex. A at 59, 71)

In the case at bar, plaintiffs aver that emails sent by ECL defendants constitute a written waiver of the termination provision. (D.I. 31 at 22) They point to the following specific emails: (a) a pre-SPA email in which Vera Cruz stated that she "doubted" that outside auditor Ernst and Young could provide the audited financial materials "in less than 30 days in a cost-effective manner" but that she "want[ed] to give it a proper go" (D.I. 2, ex. H); (b) a November 12, 2014 email sent after the dead drop date in which the Chairman of Seawood's investment committee stated "we are looking forward to a successful conclusion of this transaction" (*Id.* at ¶ 29); and (c) a November 22, 2014 email in which Alonte stated that he was "looking forward to getting this deal closed as well" (*Id.* at ¶ 31). None of these communications evidence ECL defendants' **intent** to waive the termination provision. Rather, they show a desire for a timely closing. Therefore, the court finds that ECL defendants did not waive their § 9.01(b) termination right.

Plaintiffs aver that ECL defendants breached the SPA. Plaintiffs first point to SPA § 6.07. (D.I. 31 at 20) Section 6.07 states in relevant part that parties must "use commercially reasonable efforts" to "effectuate the transactions contemplated hereby, to fulfill and cause to be fulfilled the conditions to closing under this Agreement and to

16

cause the Closing to occur as soon as practicable following the date of this Agreement."

(D.I. 2, ex. A at 57)

A termination option that comes after a drop dead date supersedes a best efforts obligation.[12] *National Data Payment Systems, Inc. v. Meridian Bank*, 212 F.3d 849, 854 (3d Cir. 2000). Plaintiffs point to ECL defendants' conduct involving Xurpas as violating SPA § 6.07(i). However, because none of ECL defendants' alleged conduct – even when taken as true – occurred prior to the drop dead date, the court finds that ECL defendants did not breach § 6.07.[13]

Plaintiffs also aver that ECL defendants breached SPA § 6.09(a). That section provides that,

> until the earlier of the Closing and the date of termination of this
> Agreement pursuant to Section 9.01, neither the Company nor any of its
> Representatives . . . shall, directly or indirectly, take any of the following
> actions with any Third Party: (i) solicit, initiate, or agree to any proposals
> or offers from any Third Party . . . (ii) participate in any discussions or
> negotiations regarding, or furnish to any Third Party any information with
> respect to, or otherwise cooperate with, or knowingly facilitate or
> encourage any effort or attempt by any Third Party to do or seek, a
> Competing Transaction;

(D.I. 2, ex. A at 58) A "Competing Transaction" is defined as "any similar transaction

that would reasonably be expected to have an adverse effect upon" the SPA. *Id.*

Plaintiffs' complaint alleges that Alonte acknowledged having met and discussed an

alternative transaction with Xurpas executives. (D.I. 2 at ¶ 37) These alleged meetings

sufficiently establish plaintiffs' claim that ECL defendants breached § 6.09.

---

[12] A "best efforts" obligation is "more exacting" than the usual duty of good faith. *National Data Payment Systems, Inc.*, 212 F.3d at 854.

[13] Furthermore, "[s]pecific language in a contract controls over general language." *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005).

ECL defendants respond by averring that plaintiffs did not plead an explanation as to how such a breach could result in any damages. Defendants support this assertion by stating that the SPA already was subject to termination.[14] (D.I. 38 at 10-12)

A breach of contract complaint may be dismissed where the plaintiffs' claims are "not tied to any damages." *Tuno v. NWC Warranty Corp.*, 552 F. App'x 140, 143 (3d Cir. 2014). The Xurpas IPO debuted on December 2, 2014, and plaintiffs allege Alonte acknowledged having met with Xurpas executives by December 4, 2014. (D.I. 2 at ¶¶ 34-37) Given that (a) the SPA was terminated on December 5, 2014, soon after the alleged meetings, (b) ECL defendants already possessed the ability to terminate the SPA, i.e., ECL defendants' alleged breach did not cause any damages, and (c) plaintiffs do not explain how this particular breach resulted in damages, the court finds that plaintiffs do not state a claim for breach of contract under § 6.09.[15]

### 2. Breach of the implied covenant of good faith and fair dealings

Under Delaware law, an implied duty of good faith and fair dealing is interwoven into every contract. *Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572, 581 (D. Del. 2007). The Delaware Supreme Court recognizes "the occasional necessity of implying contract terms to ensure the parties' reasonable expectations are fulfilled. This quasi-reformation, however, should be [a] rare and fact-intensive exercise." *Wal-Mart*

---

[14] Defendants point to the Chancery Court's line of argument, where Vice Chancellor Laster notes that any alleged § 6.09 breach could not have resulted in a failure of closing to occur on or before the termination date of November 6. (D.I. 11, ex. B at 20)

[15] Plaintiffs' citation to *NACCO Industries, Inc. v. Applica, Inc.*, 997 A.2d 1, 19 (Del. Ch. 2009), is not persuasive, as plaintiffs cannot claim that they were used as a "stalking horse" because the drop dead date had already passed. *Id.*

*Stores, Inc. v. AIG Life Ins. Co.* 901 A.2d 106, 116 (Del. 2006) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (alteration and omission in original)). In general, the implied covenant requires "a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits" of the contract. *Dunlap*, 878 A.2d at 447 (citations omitted).

"In order to plead successfully a breach of an implied covenant of good faith and fair dealing, the plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Fitzgerald v. Cantor*, Civ. No. 16297-NC, 1998 WL 842316, at \*1 (Del. Ch. Nov. 10, 1998) (citing *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, Civ. No. 13911, at 13 (Del. Ch. Nov. 2, 1995)). The covenant applies when "the contract is silent on the subject, revealing a gap that the implied covenant might fill." *Allen v. El Paso Pipeline GP Co., LLC*, 2014 WL 2819005, at \*10 (Del. Ch. June 20, 2014).

Plaintiffs point to "the parties' implicit agreement . . . that the EY audited financials for Phunware could be delivered beyond the Drop Dead Date without affording Defendants the right to terminate freely if that occurred," acknowledging that such an "implicit agreement" means "the intent of the parties was in tension with the letter of the agreement." (D.I. 31 at 24-25) This "implicit agreement," if taken as true, did not, however, create a gap in the contract: the SPA clearly provided that ECL defendants could terminate the agreement if plaintiffs did not deliver audited financials by the drop dead date. *See Nationwide Emerging Managers LLC, et al. v. Northpointe Holdings, LLC, et al.*, 112 A.3d 878, 896 (Del. 2015) ("The implied covenant of good

19

faith and fair dealing . . . does not apply when the contract addresses the conduct at issue");[16] *see also Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 637 (Del. Ch. 2011) ("[T]he implied covenant is not a license to rewrite contractual language just because the plaintiff failed to negotiate for protections that, in hindsight, would have made the contract a better deal"). Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing, therefore, does not survive ECL defendants' motion to dismiss.[17]

## C. Personal Jurisdiction

Plaintiffs allege that Seawood's contacts with Delaware are sufficient for this court to exert personal jurisdiction over Seawood. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). A plaintiff is tasked with showing "a statutory basis for exercising jurisdiction under the Delaware long-arm statute" and subsequently, showing that the exercise of jurisdiction comports with the defendant's right to due process. *Reach & Assocs.*, 269 F. Supp. 2d at 502.

### 1. Statutory basis

Plaintiffs first assert that the SPA's "consent-to-jurisdiction" provision subjects Seawood, a non-signatory to the SPA, to personal jurisdiction in Delaware. When personal jurisdiction over a party is alleged to exist as a result of a forum selection clause in a contract to which the party is a non-signatory, the court follows the three-step analysis developed in *Hadley v. Shaffer*, Civ. No. 99-144, 2003 WL 21960406, at \*4 (D. Del. Aug. 12, 2003). First, the court must determine whether the contract's forum

---

[16] Plaintiffs contend that *Northpointe* is "irrelevant" because it "lacks a scenario in which the intent of the parties was in tension with the letter of the agreement." This argument is unpersuasive, because it would allow plaintiffs to rewrite the agreement.

[17] Plaintiffs' tortious interference claim is not addressed due to the court's personal jurisdiction finding.

20

selection clause is valid. *Id.* Then, the court must decide whether the party is a third-party beneficiary or closely related party to the agreement. *Id.* Finally, the court must ascertain if the claims against the party arise from its status related to the agreement. *Id.* at *6.

Plaintiffs do not argue that Seawood is a third-party beneficiary to the SPA.[18] (D.I. 31 at 11) Instead, plaintiffs propose that Seawood is a "closely related party." *Id.* The evaluation of when a party is "closely related" to a contract turns on the party's actions after the contract was executed and derives from principles of equitable estoppel. *Capital Group Companies, Inc. v. Armour*, Civ. No. 422, 2004 WL 2521295, at *6 n. 40 (Del. Ch. Nov. 3, 2004). Plaintiffs rely primarily on the fact that the LOI identifies Seawood as the "Major Holder" of IG Group stock, the principal asset transferred in the transaction governed by the SPA.[19] (D.I. 31, ex. A at 1) Plaintiffs argue that this status means Seawood "almost certainly intended to receive benefits from the consummation of the Transaction." (D.I. 31 at 12)

Courts utilize equitable estoppel to "prevent a non-signatory from embracing a contract, and then turning its back on the portions of the contract . . . that it finds distasteful." *E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin*

---

[18] As the forum clause is valid and the tortious interference claim against Seawood arises from the SPA, the court need only investigate whether Seawood was "closely related" to the SPA such that Seawood is bound by the consent-to-jurisdiction provision.

[19] Plaintiffs also offer the facts that Vera Cruz, Seawood's Managing Director, "led the negotiation of the [LOI] and the SPA" and sent all communications using her Seawood email address as evidence that Seawood was closely related to the SPA. (D.I. 2, ex. A; D.I. 2 at ¶ 27, 30, 39; D.I. 31 at 12) Plaintiffs do not explain how these facts are relevant.

*Intermediates, S.A.S.*, 269 F.3d 187, 200 (3d Cir. 2001). There is no indication that

Seawood ever "embraced" the SPA. Unlike the defendant in *Hadley*,[20] Seawood was

entirely excluded from the SPA, insofar as the SPA provided for no payment to

Seawood.[21] For an entity to be closely related to an agreement, it must receive a **direct**

monetary or non-monetary benefit from the agreement. *Baker v. Impact Holding, Inc.*,

Civ. No. 4960-VCP, 2010 WL 1931032, at \*4 (Del. Ch. May 13, 2010).[22] Insofar as

Seawood would receive any benefit from the SPA through its status as the "Major

Holder" of IG Group stock, that benefit is indirect.[23] Because Seawood never

"embraced" the SPA, plaintiffs fail the second prong of the *Hadley* analysis.

Plaintiffs alternatively argue that Seawood is subject to jurisdiction under the

Delaware long-arm statute provision stating that a non-resident corporation is subject to

personal jurisdiction when it "[t]ransacts any business or performs any character of work

or service in the State." 10 Del. C. § 3104(c)(1). Subsection (c)(1) "requires that some

---

[20] In *Hadley*, the defendant was a majority shareholder in one party to, intended to receive a benefit from, and was actively involved in the negotiations for the agreement. 2003 WL 21960406, at \*5. The defendant in that case was referenced in the agreement and was designated to receive direct payments under the agreement's terms. *Id.* at \*1-6.

[21] Seawood was excluded from the SPA even though it was a party to the LOI because its subsidiaries were excluded from the final terms of the SPA. The SPA superseded all prior agreements, including the LOI. (D.I. 2, ex. A at 72)

[22] A party may also be closely related to an agreement if it was foreseeable that the entity would be bound by the agreement, but plaintiffs do not make a foreseeability argument. *See Baker*, 2010 WL 1931032, at \*4.

[23] Plaintiffs point to the LOI, which states that Seawood is the "Major Holder" of IG Group shares. (D.I. 31, ex. A at 1) Dennis Ignacio, Director of Seawood Resources, Inc., however, states that "Seawood is not a shareholder in . . . the 'IG Group' of companies." (D.I 25 at ¶ 5) Regardless of the control relationship that exists, plaintiffs do not allege that Seawood's benefits are direct.

22

act must actually have occurred in Delaware." *Applied Biosystems, Inc.*, 772 F. Supp. at 1466. Absent evidence of continuous and systematic contacts with Delaware (as contemplated under § 3104(c)(4)), transacting business with a Delaware corporation outside of Delaware does not satisfy Delaware's long-arm statute. *See Boone v. Oy Partek Ab*, 724 A.2d 1150, 1156 (Del. Super. 1997) ("it is clear that this section also requires that the defendant perform the act in this State").[24]

Plaintiffs again point to Vera Cruz's role in negotiating the LOI, including her use of a Seawood email address and the fact that Seawood signed the expired and superseded LOI, which contained Delaware choice of law and consent-to-jurisdiction provisions. (D.I. 31 at 13-14) The LOI and the clauses contained therein are irrelevant because plaintiffs' claims arise out of the SPA, which superseded the LOI.[25] Plaintiffs also point to Vera Cruz's role in negotiating the SPA and the SPA provision providing for Vera Cruz to become director of Phunware, a Delaware corporation. (*Id.* at 14) Ultimately, plaintiffs do not assert that Seawood did anything more than transact

---

[24] Plaintiffs' citation to *Sustainable Energy Generation Group, LLC v. Photon*, 2014 WL 2433096, at \*7 (Del Ch. May 30, 2014) is not persuasive. Although that court states that a "physical presence [in Delaware] is by no means necessary to support a finding of personal jurisdiction under the Long Arm Statute," the rule is due to the "advent of superior communications technolog[ies which are] . . . liberalizing the traditional idea of transacting business in Delaware and other states." *Id.* (internal quotation marks omitted) (citing *NRG Barriers, Inc. v. Jelin*, 1996 WL 377014, at \*3 (Del. Ch. July 1, 1996)). In *Sustainable Energy*, defendants engaged in conduct which was "directed to and received in Delaware," which was not what occurred in the present case.

[25] In order to establish specific jurisdiction, plaintiffs must demonstrate not only that an act or acts occurred in Delaware, but also that its causes of action arise from the act or the acts. *See LaNuova D & B, S.p.A v. Bowe Co., Inc.*, 513 A.2d 764, 768 (Del. 1986). As the LOI expired, the forum selection clause does not bind Seawood.

business with a Delaware corporation outside of Delaware. Accordingly, plaintiffs' allegations do not satisfy Delaware's long-arm statute.[26]

## 2. Due Process

The court must next evaluate whether an exercise of personal jurisdiction comports with due process by assessing whether Seawood possesses the requisite minimum contacts with Delaware and Delaware entities to warrant a finding of specific jurisdiction. Plaintiffs again point to the LOI's choice of law and consent-to-jurisdiction provisions and Vera Cruz's negotiations for and signature on the SPA. (D.I. 31 at 15) For the same reasons that Seawood is not subject to personal jurisdiction under Delaware's long-arm statute, subjecting Seawood to personal jurisdiction would violate due process.[27]

## 3. Jurisdictional discovery

To receive jurisdictional discovery, plaintiffs must claim that their factual allegations establish with reasonable particularity the possible existence of requisite contacts. If they do not, to allow jurisdictional discovery would "allow plaintiff to undertake a fishing expedition based only upon bare allegations." *Inno360 v. Zakta,*

---

[26]Plaintiffs' argument that the court may exercise personal jurisdiction over Seawood under a conspiracy theory of jurisdiction is not persuasive. Plaintiffs do not allege a conspiracy in the complaint and do not show that an act or effect of the alleged conspiracy occurred in Delaware. *See Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210 (Del. 1982) (holding that plaintiffs must show that "a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state").

[27] *See Walden v. Fiore*, 134 S. Ct. 1115, 1121-22 (2014) (stating that constitutionally compliant jurisdiction requires that a "defendant's suit-related conduct . . . create a substantial connection with the forum state" and that a minimum contacts analysis look at "defendant's contacts with the forum state itself, not the defendant's contacts with the persons who reside there"). Here, plaintiffs only allege that Seawood interacted with a Delaware corporation.

24

*LLC*, 50 F. Supp. 3d 587, 597 (D. Del. 2014). In addition, "the United States Supreme Court has held that courts should 'exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place [on] them.'" *Telecordia Tech, Inc. v. Alcatel S.A.*, Civ. No. 04-874 GMS, 2005 WL 1268061, at \*8 (D. Del. May 27, 2015). Jurisdictional discovery, however, is "particularly appropriate where the defendant is a corporation." *Metcalfe v. Renaissance Marine, Inc.*, Civ. No. 08-1720, 2009 WL 1408523, at \*9 (3d Cir. May 21, 2009).

Plaintiffs make two primary allegations which they contend warrant jurisdictional discovery: first, they allege that Seawood **did** have corporate affiliation with the IG Group, ECL, and Excelmind. Second, they allege that jurisdictional discovery may lead to evidence about the benefits Seawood stood to derive from the SPA.

Plaintiffs first urge that Seawood did have corporate affiliation with the other defendants, pointing to the July 8, 2014 LOI which stated that Seawood was the "Major Holder" of the IG Group.[28] (D.I. 31, ex. A at 1) However, Seawood was not a party to the SPA (D.I. 2 at ¶¶ 2, 5, 22), and plaintiffs' assertions do not account for the lapse in time between the LOI and the SPA, nor do they establish with reasonable particularity the possible existence of requisite contacts when the claim arose from Seawood's alleged tortious interference with the SPA. As such, the court does not grant jurisdictional discovery under a corporate affiliation theory.

Plaintiffs next urge that jurisdictional discovery "may lead to definitive evidence about what benefits Seawood stood to derive from the SPA," but do not give factual

---

[28] The declarations of Ignacio and Vera Cruz state that Seawood did **not** have a "corporate affiliation" with ECL, Excelmind, or IG Group and was "not a shareholder of IG Group." (D.I. 31 at 16; D.I 25 at ¶ 5; D.I. 36 at ¶ 6-8)

allegations supporting this request. (D.I. 31 at 17) To grant a request for jurisdictional discovery under such circumstances would be to allow plaintiffs to "undertake a fishing expedition based only upon bare allegations." Therefore, the court declines to allow jurisdictional discovery on this ground.

## IV. CONCLUSION

For the reasons discussed above, the court grants ECL defendants' motion to dismiss for failure to state a claim, denies ECL defendants' motion to assess costs and for a stay, and grants Seawood's motion to dismiss for lack of personal jurisdiction. An order shall issue.